NORWOOD PROMOTIONAL PRODUCTS, INC., Norwood Promotional Products Holdings, Inc., Joyce Johnson–Miller, Frank Bellis, Robert Boulware, Yvonne Marsh, Grant Lyon, David Schreiber; ING Investments, LLC, Robert Wilson; Alix Partners, Inc.; and American Appraisal Associates, Inc., Appellants–Defendants,

v.

Thomas B. ROLLER, Appellee–Plaintiff.

No. 49A04–0608–CV–473.

Court of Appeals of Indiana.

June 5, 2007.

Jonathan Polak, Steven C. Shockley, Sommer Barnard PC, Indianapolis, IN, Attorneys for Appellant, Norwood Promotional Products, Inc.

Gary Price, Joseph P. Rompala, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellant, Alix Partners, Inc.

David J. Cutshaw, Donald D. Levenhagen, Arend J. Abel, Cohen & Malad, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

This case comes to us on an interlocutory appeal. Norwood Promotional Products Holdings, Inc., Norwood Promotional Products, Inc. and their board of directors: Joyce Johnson–Miller, Frank Bellis, Robert Boulware, Yvonne Marsh, Grant Lyon, and David Schreiber; along with ING Investments, LLC, its agent, Robert Wilson; Alix Partners, Inc.; and American Appraisal Associates, Inc., appeal the trial court's denial of their motion to compel arbitration of tort and securities fraud claims alleged by Thomas Roller ("Roller") under the Indiana Securities Act.[1]

We affirm.

### ISSUE

Whether the trial court erroneously denied Norwood's motion to compel arbi-

---

1. We heard oral argument in this matter on April 11, 2007. We thank appellate counsel for their able presentations.

tration of Roller's alleged complaint for securities fraud and tort claims.[2]

## FACTS

In June of 2002, Norwood hired Roller as its chief executive officer. Subsequently, Roller and Norwood signed an employment agreement ("Employment Agreement") on August 16, 2004. The Employment Agreement contained an arbitration clause that provided, in relevant part, that "[a]ny dispute between the parties under this [Employment] Agreement shall be resolved ... through arbitration by an arbitrator selected under the rules of the American Arbitration Association...." Conf.App. at 46.[3] The Employment Agreement, by its terms, expired upon Roller's termination, and established the terms and conditions of his employment, including compensation, stock awards, and arbitration of disputes. Section four of the Employment Agreement set out Roller's base salary, bonuses, and an award of preferred stock,[4] stating,

> *Restricted Stock.* During the Term, [Roller] shall participate in the Norwood Promotional Products, Inc. Management Restricted Stock Plan ("Restricted Stock Plan"). It is intended that the Company shall, as soon as practicable after the Commencement Date [August 16, 2004], grant to [Roller] an award thereunder not to exceed 50%, but in no event less than 40%, of the aggregate number of shares of Preferred Stock (as

defined in the Restricted Stock Plan) authorized for issuance by the Company at the time of grant. Once granted, such shares Preferred Stock (as defined in the Restricted Stock Plan) shall vest in accordance with the terms of the Restricted Stock Plan and applicable grant agreements.

*Id.* at 37. In the event of Roller's termination "other than for cause or involuntary termination," Norwood would owe Roller accrued benefits, severance payment and health benefits. *Id.* at 38–39. If, however, Roller was terminated for cause or terminated his own employment "other than in an Involuntary Termination," Norwood would be responsible only for any base salary yet unpaid as of the termination date, and any accrued and unused vacation. *Id.*

The details of Norwood's stock arrangement with Roller were set out in Norwood's Management Restricted Stock Plan ("Stock Plan"), *a separate document,* which was "intended as an incentive to certain key employees of Norwood ... to contribute to its growth and success." *Id.* at 51. The parties dispute the Stock Plan's effectuation date: Roller claims that "at the time the Employment Agreement was signed, the [Stock Plan] had not yet been effectuated," and places the effective date at August 24, 2004. *Id.* at 60–61. Norwood, however, claims that the Employment Agreement and Stock Plan were

---

2. Although we recognize that the plaintiff-appellee herein, Thomas Roller, has filed suit against multiple defendants-appellants, this matter is presently before us on an interlocutory appeal contesting the interpretation of certain contracts that were executed between Norwood Promotional Products Holdings, Inc., and Thomas Roller; thus, for our convenience and ease of identifying the primary parties in the appeal, we will refer to the appellee as "Roller" and to the collective appellants as "Norwood."

3. Norwood submitted both a confidential appendix ("Conf.App.") and a general appendix ("App.") for our review.

4. Pursuant to the Stock Plan, " 'Preferred stock' means authorized shares of preferred stock, par value $0.001 per share of the [Norwood] Corporation." Conf.App. 52.

contemporaneous agreements, entered into on August 16, 2004. In either event, the Stock Plan addressed the vesting of the preferred stock and Norwood's right to repurchase those shares issued in the event of Roller's termination, stating,

> *Vesting of Participants in Shares of Preferred Stock.* When a participant is awarded shares of Preferred Stock, such Participant shall become vested in 25% of such shares on each of the first four anniversary dates of the date such shares are awarded to the Participant, so that on the fourth anniversary of the date such shares were awarded, the Participant shall have become 100% vested in such shares. Notwithstanding the foregoing, (i) a Participant shall become vested in an additional 25% (but in no event greater than a total of 100%) if a Vesting Event occurs on any date other than one of the first four (4) anniversary dates of the date such shares were awarded and (b) a Participant (so long as he or she is an employee of the Corporation at such time) shall become 100% vested (if not already fully vested) upon a Change of Control. If a Participant's employment is terminated (other than by reason of a Vesting Event) such Participant shall forfeit all of the shares of Preferred Stock which have not vested as of the date of such termination.

> \* \* \*

> *Repurchase Upon Termination of Employment.* To the extent a Participant is no longer employed by the Corporation, and if no Change of Control has occurred prior to the effective date of such termination of employment, the Corporation will have the option, which option may be exercised by the Corporation in its sole discretion within ninety (90) days after such Participant's employment with the Corporation is terminated (whether voluntarily or involuntarily), to repurchase the vested shares of Preferred Stock issued to such Participant at the Repurchase Price; provided, however, that in such a case, the Repurchase Price will be determined by a nationally recognized valuation or investment banking firm selected in good faith by the Board who will determine the Repurchase Price.... In addition, to the extent a Participant's employment with the Corporation is terminated (whether voluntarily or involuntarily), then, except with respect to any applicable vesting that occurs as a result of a Vesting Event, all unvested Preferred Stock held by such Participant shall automatically be forfeited.

*Id.* at 53. Valuation and repurchase were to occur according to the terms of the Stock Plan, which was incorporated by reference under the stock award agreement ("Stock Award Agreement"), *a third and separate document* that the parties executed to evidence their respective contractual obligations regarding any issued shares of preferred stock. Neither the Stock Award Agreement nor the Stock Plan contained an arbitration clause.

During Roller's tenure with Norwood, the company was in dire financial straits and underwent a debt/equity restructuring[5] in order to secure debt forgiveness. Due to accompanying internal conflicts not relevant herein, the relationship between the parties soured, and on December 16, 2005, Norwood contends that Roller was terminated for cause. Roller has claimed that Norwood terminated him without cause, and pursuant to what he termed "a

---

5. Pursuant to this debt/equity restructuring, Norwood's creditors, including ING Investments, LLC, accepted Norwood stock, in ex- change for a release of Norwood's debt. Norwood's App. 21.

'scheme' designed to 'sack management for cause so that Norwood would not have to pay their severance payments or the substantial amounts for their Preferred Stock.'" Appellants' Br. 6. On February 9, 2006, Norwood exercised its option to repurchase the 3,000 shares of preferred stock previously issued to Roller, and sent him a check for $3.00.

On April 14, 2006, Roller filed an action in the Marion Superior Court alleging that Norwood "schemed in violation of the [Indiana] securities act and tort law to [de]value and repurchase [his preferred stock]." Roller's Br. 1. Specifically, he argued that Norwood's Board of Directors and Alix Partners, Inc.,[6] "artificially and unlawfully devalu[ed]" his shares of preferred stock to facilitate Norwood's inexpensive repurchase of the shares. Appellants' App. 25.

On April 18, 2006, pursuant to the Employment Agreement, Roller filed a statement of claim with the American Arbitration Association alleging violation of the Indiana Wage Statute and seeking treble damages and attorney fees. He claimed that he was "terminated without cause and/or involuntarily terminated by Norwood which triggered various severance/dismissal payments … which Norwood ha[s] refused to pay." Conf.App. 3. Norwood has consented to the arbitration, and "arbitration on [the severance] claims is proceeding." Roller's Br. 2.

However, on May 15, 2006, Norwood filed a motion to compel arbitration of Roller's alleged securities fraud claims and to stay proceedings in the trial court pending completion of the arbitration. The trial court held a hearing on the matter on July 21, 2006. On August 1, 2006, the court denied Norwood's motion to compel arbitration and its request for a stay pending arbitration, from which order Norwood now brings this interlocutory appeal.

## DECISION

■ Norwood contends that the trial court committed reversible error when it denied their motion to compel arbitration of Roller's alleged securities fraud disputes. Norwood argues that Roller's alleged securities claims were arbitrable disputes under the Employment Agreement. We disagree.

■ We review a trial court's denial of a motion to compel arbitration de novo. *Showboat Marina Casino P'ship v. Tonn & Blank Constr.*, 790 N.E.2d 595, 597 (Ind. Ct.App.2003). Indiana and federal law recognize a strong policy favoring enforcement of arbitration agreements. *Safety Nat. Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 1000 (Ind.Ct.App.2005). A party seeking to compel arbitration must satisfy a two-pronged burden of proof. *Showboat*, 790 N.E.2d at 597. The party must first demonstrate the existence of an enforceable agreement to arbitrate the dispute; second, the party must prove that the dispute is the type of claim that the parties agreed to arbitrate. *Id.* Once the court is satisfied that the parties contracted to submit their dispute to arbitration, the court must compel arbitration. *Id.* (citing Ind. Code § 34–57–2–3(a)).

■ When determining whether the parties have agreed to arbitrate a dispute, we apply ordinary contract principles governed by Indiana law. *Showboat*, 790 N.E.2d at 598. In addition, "when construing arbitration agreements, every doubt is to be resolved in favor of arbitra-

---

**6.** Alix Partners, Inc. ("Alix") is a consultancy employed by Norwood to reduce costs at the company.

tion," and the "parties are bound to arbitrate all matters, not explicitly excluded, that reasonably fit within the language used." *Safety Nat.*, 829 N.E.2d at 1000 (citing *Mislenkov*, 743 N.E.2d 286, 290 (Ind.Ct.App.2001)). "However, parties are only bound to arbitrate those issues that by clear language they have agreed to arbitrate; arbitration agreements will not be extended by construction or implication." *Id.* at 289. We must attempt to determine the parties' intent at the time the contract was made by examining the language used to express their rights and duties. *Safety Nat.*, 829 N.E.2d at 1000. Words used in a contract are to be given their usual and common meaning unless it is clear from the contract and the subject matter that another meaning was intended. *Id.* at 1001.

The trial court, in denying Norwood's motion to compel arbitration or stay proceedings pending arbitration, concluded, in pertinent part, as follows:

> [Roller], an employee of Norwood Promotional Products, signed an Employment Agreement which stated: "Any dispute between the parties under *this* Agreement shall be resolved ... through arbitration...."
>
> The Employment Agreement terminated, by its terms, upon the termination of [Roller]'s employment on December 16, 2005.
>
> The Employment Agreement contained several provisions for payment of [Roller]'s salary, bonus, and health insurance upon his termination under certain circumstances. [Roller] has made a claim for these benefits in a separate claim filed with the American Arbitration Association ("AAA"). The Employment Agreement also stated that [Roller] would receive a yet-to-be determined amount of preferred stock in the future

which would be defined and vested pursuant to a restricted Stock Plan.

> The evidence is undisputed that the [Stock Plan] was not yet in existence at the time that [Roller] signed his Employment Agreement. When drafted, the [Stock Plan] did not contain an arbitration agreement.
>
> After [Roller]'s termination ... on December 16, 2005, he received, on or about February 9, 2006, a check in the amount of $3.00 purporting to be payment for the value of his 3,000 shares of Preferred Stock, which shares were purportedly valued pursuant to a formula contained in the [Stock Plan]. [Roller] alleges in this case that this subsequent repurchase of stock was made in violation of the Indiana Securities Act.
>
> Because the Employment Agreement arbitration provision restricts the arbitration of disputes to those under the Employment Agreement, because the Employment Agreement merely requires that preferred stock be awarded to [Roller], and because this claim does not allege that the stock was not awarded to [Roller], this securities fraud claim cannot be arbitrable pursuant to the plain language of the Employment Agreement.
>
> Although Norwood [Products] argues that the Employment Agreement mentions a "restricted Stock Plan" such that the Employment Agreement, with its arbitration clause, incorporates the terms of the later-drafted [Stock Plan], the Employment Agreement cannot be integrated with an agreement or document which was not even in existence when the Employment Agreement was signed.
>
> Because [Roller]'s claims in this action relate to the [Stock Plan], which [lacks] an arbitration agreement, these securities claims are not arbitrable.

Because the basis of [Roller]'s securities fraud claims did not arise until after the termination of his Employment Agreement, because the Employment Agreement did not specify that the arbitration clause survived the termination of the Employment Agreement, and because [Roller] does not make a claims [sic] for breach of the Employment Agreement herein, [his] separate securities fraud claims are not arbitrable.

Order 1–3.

A party seeking to compel arbitration must satisfy a two-pronged burden of proof. *Mislenkov*, 743 N.E.2d at 289. First, we must determine whether the parties had an enforceable agreement to arbitrate the securities fraud dispute. *Id. at* 290. As noted, the trial court found that the Stock Award Agreement and Stock Plan were separate documents and governed only the securities fraud dispute. Because neither document contained an arbitration clause, the trial court concluded that the parties had not agreed to submit the securities disputes to arbitration.

Norwood argues that the Employment Agreement's arbitration requirements apply to both the Stock Plan and the Stock Award Agreement and disputes arising thereunder; thus, making Roller's securities disputes arbitrable. We disagree. Norwood suggests that the Employment Agreement, the Stock Plan and the Stock Award Agreement are inextricably intertwined; however, upon examination, the plain language that Norwood employed when it drafted the arbitration clause indicates otherwise. We find no ambiguity in the document, and therefore, we will give the words used in the Employment Agreement their usual and common meaning, because there is no indication from the contract or the subject matter that another meaning was intended. *Safety Nat.*, 829 N.E.2d at 1001.

■■■ The arbitration clause reads, "Any dispute between the parties *under this Agreement* shall be resolved ... through arbitration". *Id.* (emphasis added). The arbitration clause is unambiguous in its meaning. When we interpret an unambiguous contract, we give effect to the parties' intention as expressed in the four corners of the instrument, and clear, plain, and unambiguous terms are conclusive of that intent. *McCord v. McCord,* 852 N.E.2d 35, 42 (Ind.Ct.App.2006). The word "this" is a singular pronoun that modifies a single agreement. Here, the use of the word "this" means *this*—not that or those. Norwood's unambiguous language evidences its intention that the arbitration requirements should apply only to the Employment Agreement.

Had Norwood intended the arbitration clause to apply to the Stock Plan and the Stock Award Agreement, Norwood could have inserted these documents into the Employment Agreement or *expressly* incorporated said documents by reference. Here, we find neither an express wholesale incorporation of the Stock Award Agreement and Stock Plan into the Employment Agreement by reference, nor any language that indicates any such intent.

We note that Norwood ensured that the Stock Award Agreement was expressly incorporated into the Stock Plan by reference; however, Norwood did not similarly incorporate the Stock Plan and Stock Award Agreement into the Employment Agreement. We agree with Roller's assertion that "if Norwood wanted to expressly incorporate the Employment Agreement into the Stock Award Agreement/[Stock Plan] or vice versa, it knew how to do so and deliberately did not do so." *Id.* Accordingly, we find that the arbitration clause must be narrowly construed to refer to the Employment Agreement alone.

Norwood correctly notes Indiana's strong policy favoring enforcement of arbitration agreements, and the general view that arbitration agreements should be interpreted in light of that policy. *Chesterfield Management, Inc. v. Cook*, 655 N.E.2d 98, 102 (Ind.Ct.App.1995). However, it is not the appellate court's policy to extend arbitration agreements by construction or implication. *Mislenkov*, 743 N.E.2d at 289. "The arbitration promise is itself a contract." *Smith v. Meijer*, 858 N.E.2d 693, 693 (Ind.Ct.App.2006). Parties are bound to arbitrate those issues that by clear language they have agreed to arbitrate. *Safety Nat.*, 829 N.E.2d at 1000 (citing *Mislenkov*, 743 N.E.2d at 289). Herein, the parties' contract is unambiguous; thus, we give the words used in the contract their plain and ordinary meaning. Accordingly, we find that Norwood has not demonstrated that the parties agreed to submit securities disputes to arbitration.[7]

Affirmed.

BAKER, C.J., and ROBB, J., concur.

---

**7.** Norwood also contends that the Employment Agreement, Stock Award Agreement and the Stock Plan are contemporaneous writings relating to the same transaction, which must be construed together in determining the contract. We agree in part. The Employment Agreement opens, "This Employment Agreement ... is entered into as of *August 16, 2004*." Conf.App. 18. Similarly, section 13 of the Stock Plan states, "The foregoing plan was approved and adopted by the Board on *August 16, 2004*." *Id.* at 77. The Stock Award Agreement closes with the language that "[the parties] have executed this Agreement, as of *August 16, 2004*," and Roller signed the Stock Award Agreement directly below this statement. *Id.* at 69, 70. The record indicates that the Employment Agreement, Stock Plan and Stock Award Agreement all came into existence on August 16, 2004. Thus, we find that the trial court erred when it found that the Stock Plan was not yet in existence when Roller signed the Employment Agreement.

Although we recognize this error, we also note a difference between construing writings together and deeming them inextricably intertwined in the face of unambiguous language to the contrary. We cannot disregard the clear language of the arbitration clause and instead apply Indiana's general rule favoring arbitration. As Roller argues, accepting this general view as a matter of controlling law in Indiana would "turn the law of contract and parties' freedom to define for themselves what disputes may be arbitrated on its head." Roller's Br. 18.